IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

BRETT EARNEST,                              )
                                           )
                       Plaintiff,          )        Civil Case No. 07-1559-KI
                                           )
         vs.                               )        OPINION AND ORDER
                                           )
GEORGIA-PACIFIC CORPORATION,               )
now known as GEORGIA-PACIFIC LLC,          )
an active Delaware corporation authorized  )
to do business in the State of Oregon,     )
                                           )
                       Defendant.          )
_____   )


        Daniel Snyder
        1000 S.W. Broadway, Suite 2400
        Portland, Oregon  97205

            Attorney for Plaintiff

Robert Lane Carey
Kristin L. Bremer
Tonkon Torp LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, Oregon   97204-2099

        Attorneys for Defendant

KING, Judge:

        Plaintiff Brett Earnest was employed at defendant Georgia-Pacific, LLC's Wauna Mill facility.  He was terminated for exceeding the number of allowed absences under the Attendance Policy.  Earnest alleges that his absences were protected by the family medical leave acts.  He brings claims for violation of the federal and state family medical leave acts, for injured worker discrimination, and for the tort of wrongful discharge.  Before the court is Defendant's Motion for Summary Judgment (#31).  For the reasons below, I dismiss the injured worker's discrimination claim and any claim under ORS 659A.230, and I allow the family leave acts and wrongful discharge claims to proceed to trial.

                                **MOTION TO STRIKE**

        Defendant moves to strike some of the evidence submitted by Earnest to oppose the summary judgment motion.  I will discuss a few of the objections.

        This is a very factually intensive case with the same process happening for the three absences at issue, in addition to other absences which were approved.  I am not surprised that Earnest's testimony, which he gave a few years after the events, has slight variations on the minutiae.

Page 2 - OPINION AND ORDER

As one example, in paragraphs 15 and 16 of his affidavit, Earnest states that he did not

get a Family and Medical Leave Act ("FMLA") Medical Certification Form as part of the packet

given him for his September 16, 2005 absence.  Georgia-Pacific contends that this contradicts

Earnest's prior testimony that he took a Certification to Dr. Kirkpatrick.

Affidavits which are inconsistent with prior deposition testimony given by the affiant

should be stricken if the court makes a factual determination that the contradictory matter is

actually a "sham" and not the result of an honest discrepancy, a mistake, or the result of newly

discovered evidence.  Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266-67 (9th Cir. 1991).

I interpret Earnest's testimony at the workers' compensation hearing as a statement that

he did not remember if he had received a Medical Certification and taken it to Dr. Kirkpatrick in

this instance.  He was testifying about his usual practice.  Thus, I do not find his affidavit

testimony on this issue to be a sham.

In paragraph 48, Earnest states, "I did not contact Dr. Kirkpatrick about this list of three

doctors because I was not told that I should review the list with my doctor."  At the workers'

compensation hearing, he stated, "I actually consulted–and I asked Rick [Dr. Kirkpatrick], if I'm

not mistaken, or somebody in his office, if they knew who these people were."  That is much

closer to contradictory testimony but the piece of evidence is not important.  I am unaware of any

violation by Georgia-Pacific when it asked Earnest to choose one of three physicians from the list

but did not tell him to consult with his doctor before making the choice.  Whether or not he chose

to consult with his doctor is not material.

Page 3 - OPINION AND ORDER

The other objections either concern evidence which is not used in my analysis or concern evidence which I mention as background but which is not material to my decision.  Granting the other objections would not have changed my analysis below.

## FACTS

Brett Earnest began working for Georgia-Pacific's predecessor in June 1995 at its paper mill in Wauna, Oregon.  Earnest was a member of the collective bargaining unit that covered hourly employees at the mill.

Earnest was aware of Wauna Mill's written Attendance Policy.  It defined unacceptable absenteeism as an absentee rate over a rolling 12 month period of 1.6 percent or greater or an absenteeism rate over a period of years consistently exceeding 1.6 percent "and reflects an ongoing inability to fulfill their commitment to be at work or to manage their personal lives so that they can be at work."  Bremer Decl. Ex. 1 at 104.  Certain types of absences are not counted in calculating this absentee rate, including floating holidays, vacation, funeral leave, jury duty, disciplinary suspensions, leaves of absence, time loss workers' compensation, FMLA leave, and Sickness and Accident ("S&A") leave which covers the employee's own sick leaves over three days long and is administered by MetLife.  Employees on S&A or time loss workers' compensation are automatically placed on FMLA leave.

Earnest was familiar with the progressive discipline policy concerning unacceptable absenteeism.  The five steps of discipline are:  (1) verbal clarification; (2) letter of discussion; (3) written reprimand; (4) suspension; and (5) termination.  Each level of discipline is invoked when an additional countable absence occurs which causes the employee's absentee rate to remain at 1.6 percent or higher.  Prior to termination, the employee is given the opportunity to

accept an Employee Assistance Program ("EAP") referral and to abide by the conditions of a

Last Chance Agreement.  The refusal to do either results in immediate termination.

Georgia-Pacific has a written FMLA and Oregon Family Leave Act ("OFLA") policy.  To

take time off work associated with illness, an employee contacts Donna Kent, Personnel

Assistant.  She provides a leave packet if the leave might be covered by the family leave acts.

Earnest states that for some of his absences, he did not receive a leave packet but got forms

available in his work area.  The company also had an arrangement with the union that if a claim

was accepted for workers' compensation or by MetLife for the S&A benefit, the company

granted an FMLA leave without additional paperwork being completed.

The company policy requires that the completed Leave of Absence Request Form and the

Medical Certification Form be submitted within 15 business days from the date the leave request

packet was received by the employee.  If the employee submits an incomplete form, the HR

representative will ask the employee to submit completed forms.  Earnest was aware of the

15 business day deadline for returning the forms.  He had successfully applied for family leave

prior to the events at issue in this case.  Failure to submit a completed Medical Certification

Form within the 15 day period results in leave being denied.

According to Ann Fleck, Georgia-Pacific does not allow an employee to retroactively

apply vacation to cover absences for which family medical leave was denied.  An employee is

allowed to use a floating holiday if the person has less than a 2.5 percent absentee rate and

requests the substitution within a week of when the person returns to work.

Earnest's supervisor, Frank Buchberger, conducted a verbal clarification with Earnest on

July 9, 2004 when his absentee rate was 3.6 percent.  On April 17, 2005, Buchberger gave

Earnest a Letter of Discussion because his absentee rate had risen to 5.59 percent due to four additional absences. These absences were counted against Earnest because he had used up his FMLA leave when he injured his back. On June 28, 2005, Buchberger gave Earnest a Letter of Reprimand because three additional absences raised the absentee rate to 6.43 percent. Earnest was still in excess of his FMLA leave time at that point. Buchberger instructed Earnest to contact the HR Department to find out when he would be eligible for more FMLA leave.

On September 16, 2005, Earnest called in sick due to a severe sinus infection. Kent sent him a leave packet. Earnest returned the Leave of Absence Request and brought the Medical Certification Form to his treating physician, Dr. Kirkpatrick.[1] When MetLife did not receive the necessary medical information, it denied the leave and sent Earnest a memo on October 12, 2005. This absence resulted in Earnest progressing to Step 4 of the Attendance Policy. On October 24, 2005, Dan Brown, then HR Director, met with Earnest and union representatives to discuss his attendance problems. Earnest told Brown that he gave the form to his doctor and thought that his doctor had completed it and sent it to Georgia-Pacific. Brown had Kent send another Medical Certification Form to Earnest and instructed him to have the doctor return it by October 31, 2005.

On November 1, 2005, Earnest provided the Medical Certification Form signed by Dr. Kirkpatrick for the September 16 absence. The Certification stated that the absence qualified as a serious health condition under the FMLA but the part of the form stating this had several cross-outs and corrections. Georgia-Pacific questioned the validity of the Certification and asked Dr. Kirkpatrick's office to send a copy of the Certification from Earnest's file. This copy of the

---

[1] In his affidavit, Earnest states that he did not get the Medical Certification Form in the first packet. Since Georgia-Pacific gave Earnest another chance to complete the form, the factual issue is not important.

Certification also had some cross-outs around that answer but clearly stated the absence did not qualify. Because it had conflicting Certifications, Georgia-Pacific contacted Dr. Kirkpatrick's office for clarification. The doctor's office manager, Vicki Doehne, checked with Dr. Kirkpatrick, who confirmed that the absence was not a serious health condition. She also checked with the nurses and none remembered changing the form, even though Earnest told her that a nurse changed it for him.

On December 2, 2005, Fleck met with Earnest to terminate him for submitting false documentation for the September 16 absence. Earnest claimed that he did not falsify the document. He went to Dr. Kirkpatrick's office to find out what had happened. Later that day, Dr. Kirkpatrick faxed a handwritten note to Kent that one of his new nurses made the change to the Certification, initialed it, and did not make a copy for the chart.

After Kent received the fax, Fleck reinstated Earnest later the same day because she was satisfied that he had not submitted falsified documentation. Kent claims she told Earnest that because the absence was not protected, however, he would go to Step 4 of the Attendance Policy and receive an administrative suspension, which did not include any time off work. Earnest denies that he was told he was going to Step 4.

Earnest was off work between December 13, 2005 to January 3, 2006, due to a combination of vacation and some absences for which Earnest sought FMLA leave on his return. On the day of his return to work, Earnest requested FMLA leave for December 13, 2005, a day he took off to care for his sick daughter.[2] Georgia-Pacific approved this leave.

---

[2] Earnest confused the dates and durations of his daughter's and his wife's illnesses when he first filed the Leave of Absence Requests. When this came to light, Earnest corrected the information. The temporary mix-up is not relevant to the issues before me so I will use the

Page 7 - OPINION AND ORDER

Also on January 3, 2006, Earnest requested FMLA leave for December 19, 20, and 21, 2005 to care for his wife who had injured her back. He attached the two-page exit instructions for his wife from St. John Medical Center, Emergency Department ("ER"), which stated that Tanya Earnest was treated by Dr. Rod Beaver on December 18, 2005 for acute back pain–lumber strain, acute lumbar strain, and acute facet syndrome. Earnest did not submit Georgia-Pacific's Medical Certification Form for this absence. On January 24, 2006, Kent sent Earnest a memo denying the leave because of the discrepancy between the Request concerning Earnest's wife's illness compared with Earnest calling Kent to report that he was sick himself. Kent also stated that the time limit for providing the Medical Certification Form had expired.

On February 13, 2006, Fleck met with Earnest to discuss that the December 19 through 21 absence triggered Step 5 of the Attendance Policy–termination unless the employee agrees to certain conditions. Earnest signed a Last Chance Agreement, to last for at least 24 months of work, which required him to accept a referral to the EAP and to meet all company standards for attendance, among other conditions.

On February 14, 2006, Dr. Kirkpatrick faxed Kent a note excusing Earnest from work from February 14 through February 19 due to illness. Kent sent the doctor a Medical Certification Form, which Dr. Kirkpatrick completed on February 17, 2006 by characterizing Earnest's stress-related anxiety as a serious health condition.

On March 22, 2006, Dr. Kirkpatrick completed another Medical Certification Form for Earnest indicating that he still suffered from the serious health condition of stress-related anxiety and that the date of his return to work was undetermined.

corrected dates.

Page 8 - OPINION AND ORDER

Earnest applied for S&A with MetLife to cover his time off for stress and anxiety. MetLife denied the claim because Earnest's stress and anxiety were related to his job. Earnest then filed a workers' compensation claim on April 3, 2006.

On April 7, 2006, Kent informed Earnest that the leave beginning February 14, 2006 was provisionally designated as FMLA leave pending a second opinion which would be done by a workers' compensation independent medical examination ("IME") doctor. Dr. Ronald Turco, a psychiatrist, performed the IME on May 8, 2006. He was unaware that his opinion would be used for anything other than Earnest's workers' compensation claim. Dr. Turco concluded that Earnest experienced some anxiety and depression which were not elevated to the level of a psychiatric diagnosis, and Earnest did not have a psychological impairment.

On May 12, 2006, Dr. Kirkpatrick released Earnest to work beginning on May 19.

Earnest's workers' compensation claim was denied on May 17, 2006.

On May 17, 2006, Fleck wrote Earnest to explain that because Dr. Kirkpatrick and Dr. Turco disagreed, the company wanted to get the opinion of a third health care provider concerning whether the February 14, 2006 leave was due to a serious health condition. Fleck provided three names of doctors and asked Earnest to pick one that was acceptable to him. The letter stated that this third opinion would be final. It also stated that Earnest could not return to work until the third opinion was obtained. Earnest asked either Dr. Kirkpatrick or someone else at the doctor's office if they were familiar with any of the three doctors and the person was not familiar with any of the names. Earnest responded to Kent on May 31, 2006 that he had no preference on which doctor.

Dr. Goranson examined Earnest on July 18, 2006. He stated in deposition that he believed the examination was only for purposes of Earnest's workers' compensation claim, but in the report he stated that Earnest did not have a serious health condition as defined under FMLA guidelines. Dr. Goranson concluded that Earnest could return to work and diagnosed him with adjustment disorder with mixed emotional features now completely resolved, related in its entirety to reasonable disciplinary action on the part of his employer, and mixed personality disorder with passive-aggressive and narcissistic features. Dr. Goranson also concluded that Earnest did not have a serious health condition because an adjustment disorder is not a serious health condition.

On August 10, 2006, Fleck wrote Earnest that Dr. Goranson concluded that Earnest did not have a serious health condition since February 13. Based on this third opinion, Georgia-Pacific withdrew the provisional FMLA designation from the leave and counted the absences against Earnest under the Attendance Policy.

Earnest was called to a meeting with Ann Fleck on August 21, 2006. At the meeting, Fleck terminated Earnest because his family leave was denied and, as a result, Earnest violated his Last Chance Agreement.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried.

Page 10 - OPINION AND ORDER

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the

evidence is viewed in the light most favorable to the nonmoving party.  Universal Health

Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.    Family Medical Leave Acts

Earnest alleges interference claims[3] under the federal FMLA, 29 U.S.C. § 2601 et seq.,

and the OFLA, ORS 659A.150 et seq.

Georgia-Pacific moves to dismiss both leave act claims because it contends that Earnest

was not entitled to take leave under either the FMLA or the OFLA for his absences on

September 16, 2005; December 13, 2005; and February 13 through May 18, 2006.

The FMLA makes it unlawful "for any employer to interfere with, restrain, or deny the

exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C.

§ 2615(a)(1).  This provision is violated "by engaging in activity that tends to chill an employee's

freedom to exercise his [] rights."  Bachelder v. America West Airlines, Inc., 259 F.3d 1112,

1123 (9th Cir. 2001).  Examples of interference include denying leave, discouraging an employee

from using leave, and using the taking of leave as a negative factor in employment actions.  Xin

Liu v. Amway Corp., 347 F.3d 1125, 1133 (9th Cir. 2003).  To prevail on an FMLA interference

claim resulting in termination, a plaintiff "need only prove by a preponderance of the evidence

that . . . taking of FMLA-protected leave constituted a negative factor" in an employment

decision.  Bachelder, 259 F.3d at 1125 (explaining why *McDonnell Douglas* burden shifting

_____

[3]  In his response brief, Earnest acknowledges that his FMLA cause of action is an
interference claim and not a discrimination or retaliation claim.

Page 11 - OPINION AND ORDER

approach would not be used). Under the OFLA, it is illegal to retaliate or discriminate against an individual because the individual has inquired about the provisions of the OFLA, submitted a request for family leave, or invoked the OFLA. ORS 659A.183(2).

I conclude that there are too many factual issues to dismiss the leave act claims. I will discuss a few of the problems briefly.

I agree with Earnest that under the FMLA, the use of leave, or inquiry about the use of leave ("attempt to exercise"), cannot be a negative factor in employment actions, whether or not the leave was granted and whether or not the employee was entitled to take protected leave. Thus, in a sense, it is not relevant whether Earnest was entitled to take protected leave for the three disputed absences. He attempted to take leave and had a lot of difficulty getting the correct forms to his employer. Earnest was briefly terminated for falsifying a Medical Certification for the September 2005 absence, a charge Georgia-Pacific later agreed was incorrect, he was not asked to provide the company's Medical Certification Form when he submitted his wife's ER paperwork to substantiate the December 2005 absence, and he went to the third and final certification procedure for the February through May 2006 absence. With this much turmoil surrounding Earnest's use of family leave, there is a factual issue on whether Georgia-Pacific considered his use of the leave acts when it disciplined him for unprotected absences.

Moreover, there are a few other problems which weaken arguments made by both sides. Although I am not making any rulings on these particulars, I note the problems now to assist the parties in preparing for trial.

First, the FMLA requires an employer to "advise an employee whenever the employer finds a certification incomplete, and provide the employee a reasonable opportunity to cure any

such deficiency." 29 C.F.R. § 825.305(d).  Earnest submitted his wife's ER paperwork to

substantiate the December 2005 absence.  Although Georgia-Pacific did not accept the

paperwork in lieu of its Medical Certification Form, it did not advise Earnest that the document

was inadequate and ask him to get the company's form completed.  It also did not follow up with

the ER or the treating physician to obtain the information required on the company's form, as

discussed in Georgia-Pacific's written medical leave policy in Section II.F.2.  I do not read

Marchisheck v. San Mateo County, 199 F.3d 1068 (9th Cir. 1999), cert. denied, 530 U.S. 1214

(2000), to say that an employer is not required to notify an employee of a deficiency nor provide

the employee an opportunity to cure, as argued by Georgia-Pacific.  This issue casts a shadow on

whether Earnest should have been put on a Last Chance Agreement.

      Second, the parties dispute the merits of the second and third certifications for the

February 2006 absence.  Both IMEs were performed primarily to make a determination about

Earnest's workers' compensation claim.  Earnest argues that the certifications were not obtained

in good faith because they are sham opinions due to the doctors' lack of familiarity with the

FMLA or the dual purpose for the examinations.  Under the FMLA:

> The employer and the employee must each act in good faith to attempt to reach
> agreement on whom to select for the third opinion provider.  If the employer does
> not attempt in good faith to reach agreement, the employer will be bound by the
> first certification.  If the employee does not attempt in good faith to reach
> agreement, the employee will be bound by the second certification.  For example,
> an employee who refuses to agree to see a doctor in the specialty in question may
> be failing to act in good faith.  On the other hand, an employer that refuses to
> agree to any doctor on a list of specialists in the appropriate field provided by the
> employee and whom the employee has not previously consulted may be failing to
> act in good faith.

Page 13 - OPINION AND ORDER

29 C.F.R. § 825.307(c). Georgia-Pacific provided a list of specialists and asked Earnest to select one. He did so and did not instead offer a different group of specialists which was refused by Georgia-Pacific. Earnest then appeared for examination. I do not see bad faith on the part of Georgia-Pacific for this conduct.

For the third certification, Dr. Goranson was asked, "Does Mr. Earnest truly have a serious health condition as defined under FMLA Guidelines?" He responded, "No." Bremer Decl. Ex. 1 at 209. Even though Dr. Goranson was also giving an opinion which would be used for the workers' compensation claim, he specifically opined about whether Earnest qualified under the FMLA. Earnest now disputes the doctor's opinion but the FMLA does not give him the right to disagree. I also see no avenue under the regulations to dispute whether a doctor understands the FMLA definitions enough to give a valid opinion. I suggest for the future, however, that providing a doctor with the definitions might ward off some of these disputes.

I see a problem with Dr. Turco's opinion in the second certification, however. I do not see any reference in the written opinion to either the FMLA or whether Earnest had a serious health condition as defined by the FMLA. Instead, Dr. Turco opined that Earnest has experienced some anxiety and depression but it was not elevated to the level of a psychiatric diagnosis. Id. at 185. This supports an inference that Earnest did not have a serious health condition under the FMLA, but Dr. Turco did not actually give an opinion on that question.

Third, Georgia-Pacific argues that the February 2006 leave lasted 14 weeks, so even if it was a protected leave, Earnest would have exhausted his 12 weeks of protected leave under the leave acts. Earnest notes that he works a schedule of four days on, four days off and implies that the 12 weeks of leave might be calculated differently than 12 calendar weeks. I agree that some

calculation is in order and suggest the parties research this issue prior to trial.  I note that a few

regulations are helpful.  "[T]he fact that a holiday may occur within the week taken as FMLA

leave has no effect; the week is counted as a week of FMLA leave."  29 C.F.R. § 825.200(f).

More to the point:  "If an employee's schedule varies from week to week, a weekly average of

the hours worked over the 12 weeks prior to the beginning of the leave period would be used for

calculating the employee's normal workweek."  Id. at § 825.205(d).

      Taking all of these issues into account, I deny the motion and leave the FMLA and OFLA

claims for trial.

II.    Injured Worker Discrimination

      Earnest alleges a claim for violation of Oregon's injured worker discrimination law,

ORS 659A.040, alleging that he was terminated for invoking the workers' compensation system.

      Georgia-Pacific moves against this claim because it contends that Earnest has no

evidence that his termination was caused by his use of the workers' compensation system.

According to Georgia-Pacific, it terminated Earnest for the legitimate reason that he violated its

Attendance Policy and Last Chance Agreement.  Georgia-Pacific relies on some cases from this

court for the proposition that temporal proximity alone is insufficient to establish causation.

      Earnest contends that there is a factual issue on whether his workers' compensation claim

was a cause of his termination.  Earnest bases his argument on the closeness of the filing of his

claim on April 2, 2006 and his termination on August 22, 2006.

      To prove a prima facie case of retaliation under Oregon's injured workers' law, a plaintiff

must establish:  (1) plaintiff invoked the workers' compensation system; (2) plaintiff was

discriminated against in the tenure, terms or conditions of employment; and (3) the employer

discriminated against plaintiff because he invoked the workers' compensation system.  <u>Williams v. Freightliner, LLC</u>, 196 Or. App. 83, 89, 100 P.3d 1117 (Or. App. 2004).  The causal link can be inferred from circumstantial evidence, such as the proximity in time between the protected activity and the retaliatory employment decision.  <u>Stegall v. Citadel Broadcasting Co.</u>, 350 F.3d 1061, 1069 (9th Cir. 2003) (only nine days lapsed between complaint and termination).  <u>See also</u> <u>Clark County School District v. Breeden</u>, 532 U.S. 268, 273-74, 121 S. Ct. 1508 (2001) (citing with approval cases holding that a three month period and a four month period were insufficient to establish causation for a prima facie case when there is no causation evidence beyond the temporal proximity).

Four and one-half months passed between when Earnest filed his workers' compensation claim and when he was terminated.  There is no other proof that filing the claim caused the termination.  Under <u>Stegall</u>, the interim is too long to raise a factual issue on causation.  Accordingly, I grant summary judgment and dismiss the injured workers' discrimination claim.

III.   <u>Wrongful Discharge</u>

Earnest alleges a claim for wrongful discharge.  He claims that Georgia-Pacific terminated him because he exercised his family leave rights.[4]  Discharge in retaliation for invoking rights under the OFLA states a claim for wrongful discharge.  <u>Yeager v. Providence Health System Oregon</u>, 195 Or. App. 134, 142-43, 96 P.3d 862 (2004).

---

[4] Earnest also alleges that Georgia-Pacific terminated him because he exercised his workers' compensation rights.  In response to Georgia-Pacific's motion, Earnest concedes that his claim for wrongful discharge, based on filing the workers' compensation claim, is preempted by the adequate statutory remedy provided by that act.

Georgia-Pacific moves to dismiss the wrongful discharge claim for two reasons.  First, it contends that Earnest has no evidence to connect the exercise of his rights under the OFLA to his discharge.  My analysis for the leave act claims also applies to this argument to dismiss the wrongful discharge claim.

Second, Georgia-Pacific argues that Earnest also has an adequate statutory remedy under the OFLA.  This precise issue is not address in <u>Yeager</u>.

Earnest cites several cases to dispute that the OFLA claim provides an adequate statutory remedy, and thus precludes the wrongful termination claim, because of the difference in types of damages available under each claim.

In <u>Rush v. Oregon Steel Mills, Inc.</u>, No. CV06-1701-AS, 2007 WL 2417386 (D. Or. Aug. 17, 2007), the court explained that the lack of emotional distress damages under the FMLA and OFLA make the statutory remedies inadequate because they fail to "'capture the personal nature of the injury done to a wrongfully discharged employee as an individual.'" <u>Id.</u> at *6 (quoting <u>Holien v. Sears, Roebuck and Co.</u>, 298 Or. 76, 97 (1984)); <u>see also</u> <u>Washington v. Fort James Operating Company</u>, 110 F.Supp.2d 1325, 1334 (D. Or. 2000).  I agree with the analysis in <u>Rush</u> and adopt it as my own.  Consequently, I deny the motion for summary judgment against the wrongful discharge claim.

IV.    <u>Retaliation for Bringing a Civil Proceeding</u>

Earnest notes in his response brief that Georgia-Pacific failed to move against his claim under ORS 659A.230 for retaliation in bringing a civil proceeding.  He claims to have alleged this claim in paragraph 62 of the Complaint, which states:

62. Defendant, through its agents and/or employees, violated these public policies by retaliating against the plaintiff and by terminating the plaintiff's employment because during plaintiff's employment, to wit: 1) plaintiff exercised his rights under OFLA; 2) plaintiff exercised his workers' compensation claim rights, including, but not limited to, resisting discrimination by refusing to resign.

This paragraphs is under the Fourth Claim for Relief (Wrongful Discharge). Although I do not require a lot of detail to plead a claim under notice pleading recognized by this court, I require more than this. No defendant could realize that Earnest wanted to allege a separate claim in this paragraph under a statute which is mentioned nowhere in the Complaint.

I grant summary judgment that Earnest may not go forward on a claim under ORS 659A.230.

## CONCLUSION

Defendant's Motion to Strike (#51) is denied. Defendant's Motion for Summary Judgment (#31) is granted in part. I dismiss the injured worker's discrimination claim and any claim under ORS 659A.230. The family leave act and wrongful discharge claims will proceed to trial.

IT IS SO ORDERED.

Dated this _____25th_____ day of November, 2008.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge


Page 18 - OPINION AND ORDER